**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SALVACION B. GARRISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 04-0429-WS-M** |
| | ) | |
| **TRAVEL CENTERS OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on defendant Travel Centers of America's Motion for Summary Judgment (doc. 17), as well as on defendant's Motion to Strike (doc. 31). Both motions are ripe for disposition at this time.

**I.      Background.**[1]

Plaintiff Salvacion B. Garrison ("Garrison") brought this action against defendant Travel Centers of America ("Travel Centers") alleging unlawful discrimination on the basis of her race and national origin in violation of 42 U.S.C. § 1981. According to the Complaint (doc. 1), defendant wrongfully denied plaintiff a promotion to the position of Restaurant Manager because she is Filipino, then demoted and discharged her for the same reason. In its Rule 56 Motion, Travel Centers contends that Garrison neither applied nor was qualified for the promotion, and that she was properly removed from her position because of unsatisfactory job performance.

---

[1]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 353 F.3d 1287, 1292 (11th Cir. 2003) (on summary judgment, "the district court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor"). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

### A.      Plaintiff's Employment History at Travel Centers.

Although the events of interest in this action occurred predominantly in 2002, the parties' relationship dates back to March 1997, when Garrison applied for a cook position at the Travel Centers establishment in Grand Bay, Alabama.  (Defendant's Exh. A.)[2]  Like other Travel Centers facilities, the Grand Bay location is what is characterized in the popular vernacular as a "truck stop," essentially a combination gas station, convenience store, fast food outlet, restaurant, and parts supplier. Garrison sought employment in the restaurant section (or "profit center," to use defendant's terminology).  In April 1997, plaintiff was hired as a Cook I at the Grand Bay location, where she worked full time and was paid $6.25 per hour.  (Defendants' Exh. B.)[3]

On the strength of a string of performance ratings ranging from effective to excellent, Garrison ascended rapidly through the ranks at the Grand Bay restaurant.  In January 1998, plaintiff received a

---

[2]      Defendant's Exhibit A is a copy of plaintiff's employment application, and is one of dozens of exhibits that the parties have submitted on summary judgment without authentication or verification of any kind.  Generally, courts ruling on Rule 56 motions may consider only admissible evidence.  *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted).  Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.  *Bozeman v. Orum*, 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002).  Those requirements were not followed as to most exhibits submitted by the parties here.  Nonetheless, there appears to be no dispute that "Defendant's Exhibit A" is in fact a true and accurate copy of plaintiff's job application; as such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis.  The same rationale applies to numerous other unverified, unauthenticated exhibits in the record.  Even so, the proper procedure would have been for the parties to undertake to verify their Rule 56 exhibits via deposition, affidavit or otherwise, which they have not done.

[3]      The "Employee Information" sheet found at Defendant's Exhibit B identifies Garrison's hire date as April 2, 1997.  Nonetheless, the record is rife with inconsistencies as to the exact hire date. Certain other personnel documents list Garrison's hire date as October 14, 1996.  (*See* Defendant's Exhibits M, Z.)  Plaintiff herself avers that she was hired by Travel Centers on October 14, 1996. (Garrison Aff., ¶ 2.)  Defendant identifies plaintiff's hire date as "March 20, 1991," although the "1991" designation is plainly a typographical error.  (Defendant's Brief, at 1.)  Notwithstanding this confusion, the Court need not resolve the discrepancy or ascertain plaintiff's precise date of hire for purposes of the instant motion.

performance rating of "excellent," as a result of which she was promoted to Cook II and received a raise to $7.25 per hour.  (Defendant's Exh. H, I.)[4]  A year later, in April 1999, Travel Centers awarded plaintiff a promotion to "Cook III" and a concomitant wage increase to $8.00 per hour. (Defendant's Exh. J.)[5]  The process repeated itself in the spring of 2000 and the spring of 2001, with plaintiff again receiving positive assessments of her performance as a cook and merit pay increases. (Defendant's Exh. K, L.)

Plaintiff's meteoric rise at Travel Centers continued in May 2001, when she was promoted to the position of Assistant Profit Center Manager ("Assistant Manager") for the Grand Bay restaurant. (Garrison Dep., at 77.)[6]  This promotion entailed a substantial pay increase from an $8.30 hourly wage to a $21,500 annual salary.  (Defendant's Exh. M.)  As Assistant Manager, plaintiff's duties included scheduling, paying bills, performing inventory, taking orders in the computer, interviewing applicants, ensuring that the restaurant's groceries were labeled and stocked, being in charge of the restaurant safe, counting the money to verify that funds on hand balanced receipts, keeping the restaurant clean, supervising hourly employees (including cooks, waitresses, cashiers, and dishwashers), handling personnel and other problems, and managing customer relations.  (Garrison Dep., at 77-81, 85.)  The job description for the Assistant Manager post reflected that plaintiff had responsibility both for individual goals and for the performance of the Grand Bay restaurant, in terms of profitability, employee

---

[4]     Defendant has designated Exhibit H as Garrison's 1998 performance evaluation, and Exhibit I as the Personnel Action Form effectuating her promotion and pay increase.  (Defendant's Brief, at 2.)  However, the order of those exhibits was reversed in defendant's electronically filed pleadings, such that the evaluation was filed as Exhibit I, and the Personnel Action Form as Exhibit H.

[5]     Defendant's counsel represents that plaintiff's performance evaluation for that year resulted in an "effective" rating.  (Defendant's Brief, at 2-3.)  But defendant neglects to provide a copy of the pertinent evaluation or other supporting documentation.  In the absence of any evidence, the Court makes no assessment of plaintiff's rated performance for the 1998-99 period.

[6]     Plaintiff alleges that the promotion occurred in April 2001, rather than in the following month.  (Garrison Decl., ¶ 5.)  She offers no explanation for why she fixes her promotion date earlier than the company's personnel records, which reflect a May 2001 promotion.  However, this discrepancy is immaterial.

retention and training, and customer service/satisfaction. (Defendant's Exh. N.) Garrison had no significant managerial experience prior to this promotion. (*Id.* at 51-52; Defendant's Exh. A.)[7]

In connection with Garrison's promotion, Travel Centers sent her to its restaurant in Albany, New York for training as an Assistant Manager in October 2001. (Garrison Dep., at 90; Plaintiff's Exh. A.) There, she spent two weeks training with the Albany store manager on restaurant procedures, office procedures, administrative procedures, supervision of employees, and computer utilization. (Garrison Dep., at 89, 91-92.) During that training, plaintiff was issued a "Training Progress Report Card," rating her "meets expectations" or "above expectations" in all aspects of the training. (*Id.* at 96-97; Plaintiff's Exh. A.) From May 6-11, 2002, Travel Centers sent Garrison to Lodi, Ohio for a week of advanced management training in her capacity as Assistant Manager. (Garrison Dep., at 97, 100-05.)[8] Garrison was permitted to proceed with this additional training only because she passed a screening pretest. (Garrison Decl., ¶ 10.) At the close of the Ohio training, Garrison believed that she "had the tools necessary to handle [her] position," and anticipated putting her knowledge into practice at Grand Bay. (*Id.*, ¶ 11.)

Upon becoming Assistant Manager, Garrison worked with and was supervised by Kathy Martin, who was then the Restaurant Manager for the Grand Bay location, from April 2001 until May 2002.[9] Martin, a white female, found that plaintiff was "a very motivated employee who was eager to

---

[7]     To be sure, plaintiff had been a "breakfast manager" at a Burger King franchise in 1995-96. (Defendant's Exh. A.) However, plaintiff acknowledged that her managerial title at Burger King was hollow, inasmuch as she did not supervise anyone, was not paid a salary, and really just had responsibility for opening the restaurant, after which she cooked food. (Garrison Dep., at 51-52.)

[8]     All new managers at Travel Centers (including Assistant Managers) are required to attend advanced manager training in Ohio after assuming managerial duties. (Hendley Dep., at 50-52.) Thus, Garrison's attendance at this training in May 2002 placed her on an equal footing with all other Travel Centers managers.

[9]     Martin had been promoted internally to the position of Restaurant Manager in December 2000. (Defendant's Exh. EE.) Martin avers that she neither submitted an application for the job, nor sought that position at all, but rather that she was approached by her general manager and was asked to accept the promotion, notwithstanding her lack of formal training or orientation for the job. (Martin Decl., ¶¶ 3-4.)

learn all aspects of the operation, and worked very well with customers and other employees." (Martin Aff., ¶ 7.)  Martin also reported that she and Garrison worked well together, and that Martin never had occasion to counsel or discipline plaintiff.  (*Id.*, ¶ 5.)  Plaintiff testified that Martin prepared a performance evaluation for her (Garrison Dep., at 97); however, the summary judgment record fails to identify any appraisal that Martin may have prepared for Garrison following the latter's promotion to Assistant Manager.

The uncontroverted evidence is that all was not well at the Grand Bay restaurant under Martin and Garrison's watch.  This location consistently failed to meet its performance objectives during 2001 and 2002.  (Connelly Aff. II, ¶ 7; Hicks Aff., ¶ 7.)  Because of these unsatisfactory results, in April 2002, the Grand Bay facility's General Manager, Ron Hicks, contemplated replacing both Martin and Garrison.  (Hicks Aff., ¶ 7.)  In May 2002, on the recommendation of Travel Centers corporate official Terrance Connelly (a Restaurant Specialist responsible for overseeing the Grand Bay location), Hicks offered Martin a demotion to Assistant Manager to enable her to sharpen her management skills through side-by-side training with another Restaurant Manager.  (Connelly Aff. II, ¶¶ 8-9; Hicks Aff., ¶¶ 8-9.)  This offer was triggered by the restaurant's unsatisfactory performance and Travel Center's assessment that Martin needed further training.  (Connelly Aff. II, ¶ 9; Hicks Aff., ¶ 9.)  Martin rejected this suggestion, and resigned shortly thereafter, in May 2002.  (Connelly Aff. II, ¶¶ 10-11; Hicks Aff., ¶ 10.)[10]  Plaintiff's testimony reflects that Martin's resignation was quite sudden, inasmuch as she did not even turn in pending paperwork.  (Garrison Dep., at 108.)

### B.    The May 2002 Restaurant Manager Position.

#### 1.    Managerial Staffing in the Wake of Martin's Departure.

With Martin's resignation, the Restaurant Manager position at the Grand Bay facility became vacant.  Thereafter, Garrison and the restaurant's lead waitress, Michelle Tyner, worked together in

---

[10]    In her declaration, Martin maintains that the catalyst for her resignation was the death of her father in May 2002.  (Martin Decl., ¶ 5.)  Be that as it may, nothing in Martin's declaration, or in the record generally, contradicts defendant's evidence regarding the performance of the restaurant and defendant's offer of demotion to Martin for training purposes in an effort to reverse the subpar results posted by the Grand Bay restaurant.

operating the restaurant for approximately one week.  (Tyner Aff., ¶ 7; Garrison Decl., ¶ 13.)  At that time, Connelly traveled to Grand Bay to assist with managing the restaurant until a replacement for Martin could be secured.  (Connelly Aff. I, ¶ 6; Garrison Dep., at 108.)[11]

During the time that Connelly was at the restaurant, he handled paperwork and office responsibilities, and instructed Garrison to focus her efforts on the front of the house.  (Garrison Dep., at 109-11; Garrison Decl., ¶ 14.)[12]  Throughout this interlude, Connelly (who was actively involved in

---

[11]      In this regard, plaintiff's contention that she "was placed in the position of restaurant manager, but [she] still had the title of assistant manager" (Garrison Decl., ¶ 13) is accepted as true; however, this arrangement was extremely short-lived, as Connelly arrived within days to assume managerial responsibilities while Travel Centers recruited a new Restaurant Manager.  Plaintiff's brief also states that she "performed well" while filling in for Martin.  (Opposition Brief, at 9.)  As she has offered not a shred of evidence to support such a conclusion, the Court cannot simply accept plaintiff's counsel's uncorroborated representation for Rule 56 purposes.  *See infra*, note 12.

[12]      In her corrected opposition brief (doc. 29), plaintiff maintains (with no record citations) that after Connelly's arrival, she was not "allowed to perform any management duties."  (Opposition Brief, at 3-4.)  The Court is unable to discern any support for this assertion in the record; to the contrary, it appears undisputed that plaintiff was assigned front-of-the-house managerial responsibilities by Connelly.  This fact illustrates larger defects in plaintiff's brief, such as its paucity of record citations to support her allegations, its inclusion of facts that do not correspond to the cited sections of the record, and its use of the first person in portions of the factual narrative.  Local Rule 7.2(b) requires a party responding to a Rule 56 motion to "point out the disputed facts appropriately referenced to the supporting document or documents filed in the action."  *Id.*  By submitting a lengthy factual narrative that is nearly devoid of record citations, plaintiff apparently would shift the burden to the Court to sift through record material in search of support for her factual allegations.  It is not incumbent on this Court to do so.  *See* LR 7.2(b); *see generally Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial.")  Moreover, the unsupported representations of counsel do not constitute evidence that may be considered on summary judgment.  *See, e.g., Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Jordan v. Warehouse Services, Inc.*, 81 F. Supp.2d 1257, 1263 n.10 (M.D. Ala. 2000) (unsworn statement of counsel is not evidence and cannot be considered in evaluating motion for summary judgment); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements

the hiring process for a new Restaurant Manager) observed first-hand plaintiff's job performance as an Assistant Manager.  (Connelly Aff. I, ¶¶ 8, 11.)  He was dissatisfied with her efforts in several areas, including her demonstrated inability to complete end of day reports without assistance, her recurrent neglect of the restaurant floor where she was assigned, and her propensity to remain in the kitchen instead of interacting with customers.  (*Id.*, ¶ 9.)  Based on his personal observations, Connelly deemed Garrison unqualified to serve as Restaurant Manager, and found that she had substantial difficulty completing her existing Assistant Manager functions.  (*Id.*, ¶ 10.)[13]

> 2.      *The Job Posting.*

On May 14, 2002, Travel Centers posted on its Intranet an opening for the position of Restaurant Profit Center Manager for the Grand Bay, Alabama location.  (Sebera Aff., ¶ 4 & Exh. A.)  This Intranet is used as a communication system and data base for management level employees, including job postings and applications.  (*Id.*, ¶ 5.)  According to the May 14 posting, "Candidates MUST be in current position for 18 months to be eligible for a new assignment and/or relocation."  (*Id.*, ¶ 6 & Exh. A.)  The 18-month rule identified in that posting is reinforced by Travel Centers' written policy for posted managerial jobs, which provides that "an employee must have been in his/her current assignment for a minimum of eighteen (18) months" in order to apply for a posted position.

_____

of counsel do not substitute for evidence").  Thus, the Court is not bound to accept, and declines to adopt, plaintiff's counsel's unsupported representation that Garrison was stripped of all managerial duties after Martin resigned.  In so concluding, however, the Court does not embrace, and indeed specifically rejects, defendant's bewildering suggestion that plaintiff's statement of facts must conform to Eleventh Circuit procedural rules.  (Reply Brief, at 1 n.1.)  This case is pending in the Southern District of Alabama; as such, procedural rules governing practice in the Eleventh Circuit Court of Appeals obviously have no application here.

[13]      Connelly's conclusion that Garrison was not then capable of serving as Restaurant Manager finds an improbable ally in Garrison's deposition testimony.  She acknowledged that in her Ohio training in May 2002, she was given a "road map" of skills to acquire and hone as an Assistant Manager before she could advance further.  (Garrison Dep., at 104-06, 111.)  Garrison conceded that she "wasn't ready to be a manager" at that point, and that there were numerous additional skills that she would have to "learn, work on it and try my best I could to reach my goal to become higher."  (*Id.* at 111-12.)  Until she had had an opportunity to practice skills taught her in Ohio, Garrison testified, she was not ready to be a manager.  (*Id.* at 115.)

(Defendant's Exh. HH.)[14]

On its face, the posting expired on May 21, 2002.  (Sebera Aff., ¶ 7 & Exh. A.)  Not a single internal candidate responded during the designated period for submitting applications.  (*Id.*, ¶ 8.) Inasmuch as the posting was placed on an Intranet for management level employees of Travel Centers and Garrison was then an Assistant Manager, she should have had access to it.  Confronted with evidence of the Intranet posting, Garrison proffers no evidence that she lacked actual knowledge of or access to it.  Moreover, it is uncontroverted that Garrison never apprised Connelly or any other Travel Center official of her interest in the Restaurant Manager job vacated by Martin.  (Connelly Aff. I, ¶ 7.)

> 3.      *The Selection of Hendley as Restaurant Manager.*

Mark Hendley had worked as a manager at Travel Centers from 1992 through 2000. (Hendley Dep. at 12; Defendant's Exh. U.)  After leaving for a higher paying position in October 2000, Hendley had continued to work in restaurant management at truck stops until December 2001, before enduring a five-month spell of unemployment.  (Defendant's Exh. U; Hendley Dep., at 24, 27.)

Connelly was familiar with Hendley's restaurant management skills based on having worked with him at Travel Centers in the past.  (Connelly Aff. I, ¶ 12.)  Relying on these prior dealings, Connelly's assessment was that Hendley could efficiently and effectively manage restaurant staff, address customer needs, and complete management paperwork.  (*Id.*, ¶ 13.)  Accordingly, Connelly contacted Hendley, encouraged him to apply for the Restaurant Manager vacancy in Grand Bay, and mailed him an application.  (*Id.*, ¶ 14; Hendley Dep., at 24-25, 27, 29.)  Hendley applied and was interviewed by General Manager Ron Hicks in early June.  (Connelly Aff. I, ¶ 15; Hendley Dep., at 43-44.)  Some time later, Travel Centers offered him the job.  (*Id.*)  On June 6, 2002, Hendley was officially hired as Restaurant Profit Center Manager for Grand Bay, at a salary of $40,000 per year.

---

[14]      The copy of the policy submitted by defendant with its summary judgment materials bears the date of April 12, 2005, which is presumably when it was printed from the Intranet for use in this case.  (Defendant's Exh. HH.)  There is no indication as to whether this policy was in force as of May 2002, the relevant time frame here.  This shortcoming in defendant's proof is not catastrophic, inasmuch as the job posting itself specifically referenced the 18-month prerequisite to eligibility for this position.

(Hendley Dep., at 42-43; Defendant's Exh. T.)[15]  Because he was required to attend orientation/training in Chicago prior to assuming his duties, Hendley's first day of work in Grand Bay was June 18, 2002.  (Hendley Aff., ¶ 2; Hendley Dep., at 41-43.)

### C.     Plaintiff's Separation from TA.

Unfortunately, Hendley's arrival at the Grand Bay restaurant did not usher in an era of tranquility and success for Garrison in her role as Assistant Manager.  Instead, the next seven weeks marked a turbulent time in which Garrison experienced dissatisfaction with her work assignments while Hendley experienced dissatisfaction with Garrison's performance.

#### 1.     Managerial Assignments for Garrison.

Hendley took primary responsibility for computer and other office tasks, directing Garrison to concentrate on managing restaurant floor operations and taking care of customers.  (Garrison Dep., at 117-18; Garrison Decl., ¶ 16.)  This allocation of duties upset plaintiff, who was eager to practice the computer skills she had been taught during her recent training.  When she would ask Hendley for help in performing computer tasks that she had forgotten how to perform, Hendley would respond that he did not have time to show her how to perform those tasks or for her to work on the computer or complete paperwork.  (Garrison Dep., at 124-25.)[16]  According to Garrison, Hendley did not appear busy when she requested his assistance, yet he still declined to help her.  (*Id.* at 124-28.)  More generally, plaintiff complained that Hendley did not communicate with her well and that he ignored her.  (Garrison Dep., at 117, 122.)  In fact, Garrison indicated that Hendley did not talk to her at all.  (*Id.* at 141.)

On June 19, 2002, shortly after Hendley's arrival, a Trainee Restaurant Manager named

---

[15]     Garrison was not considered for the Restaurant Manager position.  (Hicks Aff., ¶ 11.) According to Ron Hicks, General Manager of Travel Center's Grand Bay location, Garrison was not considered because her performance as an Assistant Manager had been "subpar," "she lacked management capability," and she had not served as Assistant Manager for 18 months, as required by the company for promotion eligibility.  (Hicks Aff., ¶ 11.)

[16]     Another employee, a lead waitress named Michelle Tyner, averred that Garrison lacked knowledge in how to generate reports following Martin's resignation, that Garrison was unable to teach Tyner how to prepare those documents, and that Tyner taught herself how to perform those functions until Connelly arrived.  (Tyner Aff., ¶ 8.)

Michele White was hired by Connelly and sent to the Grand Bay location for training. (Defendant's Exh. FF; Connelly Aff. II, ¶ 13; Hicks Aff., ¶ 17; Hendley Aff., ¶ 4.) Hendley was responsible for training White. (Garrison Dep., at 120-21.) The uncontroverted evidence is that White was not hired as Assistant Manager at the Grand Bay location, that she was never considered an employee of the Grand Bay location, that she was there to be trained as a Restaurant Manager, and that following her training Travel Centers sent her to its Ashland, Virginia location to be a Restaurant Manager. (Connelly Aff. II, ¶¶ 13-16; Hicks Aff., ¶¶ 17-18.) White was not hired to replace Garrison; to the contrary, she was in a different job category and was paid by a different authority. (Connelly Aff. II, ¶¶ 14-15; Hicks Aff., ¶ 17.) Nonetheless, viewed in the light most favorable to plaintiff, the record reflects that White performed certain managerial duties that Garrison otherwise would have performed. (Garrison Decl., ¶ 19.) White remained at the Grand Bay restaurant until September 2002, when she was transferred to the Virginia location. (*Id.*, ¶ 21; Hendley Dep., at 88-89.) The record is silent as to the identity or race of the person hired to fill the Assistant Manager job following Garrison's departure from the company.

> 2. *Plaintiff's Performance Issues.*

Garrison testified that Hendley never had to counsel her about her performance, that he never wrote her up, and that he never had to instruct her to perform her job duties differently. (Garrison Dep., at 121-22.) Notwithstanding these blanket denials, Garrison has not rebutted several specific instances of discipline or counseling identified by Travel Centers.[17]

Hendley testified that he counseled Garrison on three occasions between mid-June 2002 and late July 2002 for failure to perform necessary managerial duties during peak restaurant hours.

---

[17] To the contrary, in plaintiff's declaration, she admits that she received a written warning from Hendley in early July 2002 and a "very poor evaluation" from him several weeks later. (Garrison Decl., ¶¶ 17-18.) Plaintiff offers no explanation for this discrepancy, despite the fact that her declaration directly contradicts her testimony under oath during her deposition that Hendley had never counseled her, never written her up, and never advised her that she was not performing any aspect of her job correctly. (Garrison Dep., at 121-22.) Because plaintiff herself has disavowed the conclusory denials proffered in her deposition and has admitted that they are not correct statements of fact, the Court will not rely on them for summary judgment purposes.

(Hendley Dep., at 52.)[18]  The first occasion was during a busy lunchtime in early July, when the restaurant was shorthanded.  Hendley was working on the restaurant floor helping bus tables and deliver food, only to observe that plaintiff was nowhere to be seen.  Upon finding plaintiff in the prep area, he instructed her that she needed to be on the floor helping during "hot times" for the restaurant, particularly when it was shorthanded.  (*Id.* at 52-54.)[19]  The same circumstances repeated themselves a few days later, as Garrison was found in the prep area putting corn bread in bags during a hectic, understaffed lunch.  (*Id.* at 54.)  Hendley again confronted her, telling her that "it's very important" for her to be out front during lunchtime, reminding her that he had already spoken to her about this issue, and explaining that it is part of "any manager's job" to be on the restaurant floor during a rush.  (*Id.*)  He informed Garrison that he believed she was avoiding the front of the house, but that a good manager has to be out front.  (*Id.* at 69.)  Garrison responded by bursting into tears.  (*Id.*)

The third occasion was July 21, when the restaurant was "extraordinarily busy" during lunchtime.  (*Id.* at 58.)  Once again, Garrison was nowhere to be seen on the floor, so Hendley summoned her to the front to help out.  Plaintiff emerged from the prep area; however, instead of assisting with the busy lunch crowd as her supervisor had instructed, she sat down and ate lunch with

---

[18]     Plaintiff's brief maligns Hendley's testimony about these events as "purely self-serving" and "after-the-fact damage control."  (Opposition Brief, at 10.)  She also suggests that Hendley must have fabricated these incidents given his testimony that he generally worked the day shift and that Garrison generally worked the evening shift, and the absence of written warnings from these events. (*Id.* at 9.)  However, plaintiff offers no specific denials or other evidence refuting Hendley's account. As for the shift issue, the record shows that Hendley scheduled Garrison to work the day shift (6 a.m. - 3 p.m.) at least four days per week, and that he or White was always present during those shifts because of concerns about Garrison's performance and customer service abilities.  (Hendley Aff., ¶¶ 6-8.)  And the lack of written discipline emanating from these events is not evidence that they did not occur, especially given Hendley's testimony that Travel Centers managers may give verbal warnings. (*Id.* at 72.)  As such, the only evidence before the Court for Rule 56 purposes is that these three incidents occurred as Hendley described them.

[19]     Hendley informed Garrison that he understood that new managers tend to hang out in the area of the restaurant where they are most comfortable, which in Garrison's case was the prep area, since she had previously been a cook.  (Hendley Dep., at 60.)  Nonetheless, he explained, she needed to be out front helping the staff and talking to customers.  (*Id.*)

her husband. (*Id.* at 58-59.)  In light of Hendley's previous counseling of Garrison on this precise

subject, he construed her behavior as willful disobedience of his order and disinterest in serving as an

Assistant Manager. (*Id.* at 64-65.)  He did not memorialize any of these incidents in formal written

warnings. (*Id.* at 53, 72.)

      The three lunchtime incidents confirmed Hendley's perception that Garrison assiduously

avoided the front of the restaurant, preferring to stay in the back of the house, even though her job was

to be on the restaurant floor working with customers and waitstaff, ensuring that everything went

smoothly. (*Id.* at 68.)  The day after the July 21 incident, Hendley informed Hicks that he felt Garrison

was unable to be an effective Assistant Manager because she "avoided the front, pretty much all of the

time"; however, Hendley also stated that she was strong in kitchen and that he would like to retain her

as a cook "because she was a good worker". (Hendley Dep., at 65-68.)  Hicks responded that if

Hendley felt Garrison was incapable of being an Assistant Manager, then appropriate action should be

taken. (*Id.* at 65.)

      As if the three lunchtime incidents were not enough, Hendley wrote Garrison up for violating

company policy in early July 2002.  In a written employee counseling report dated July 10, 2002,

Hendley disciplined Garrison for failing to report a work-related injury, in violation of company policies.

(Defendant's Exh. X.)  The report, which was signed by Garrison and Hendley, warns that recurrence

of such conduct would result in termination of employment. (*Id.*)

      Pursuant to his duties as Restaurant Manager, Hendley prepared quarterly evaluations for the

Assistant Manager.  On July 28, 2002, Hendley met with Garrison to discuss her performance

appraisal for the second quarter of 2002.  That evaluation rated her "unsatisfactory" in eleven

categories, including both restaurant objectives (*e.g.*, table turn time, achievement of budgeted

EBITDA, coverage ratio, labor control, turnover), as well as personal objectives such as preparation of

quality checklists, completion of reports and requests in an accurate and timely manner, special

projects, and pre-shift meetings. (Defendant's Exh. O.)  In a notation on the review, Hendley wrote,

"Sally is not developing as APCM as quickly as TA standards require - overall rating - U." (*Id.*)

When Hendley presented this appraisal to her, Garrison became upset, arguing that Hendley did not

know her well enough to give her such a rating.  (Garrison Dep., at 141-42.)[20]  Nonetheless, many of the restaurant performance metrics were quantifiable, objective criteria (*e.g.*, table turn time, EBITDA, employee turnover, coverage ratio, etc.), and she does not argue that the store's performance actually did satisfy any of those yardsticks in the second quarter of 2002.  Furthermore, plaintiff acknowledged in her deposition that even though certain of the performance measures were things that she had just learned about in her May 2002 training, they were her responsibility.  (*Id.* at 147-49.)  She also conceded that she did not understand certain of the performance objectives or even know what those line items on the evaluation were referring to.  (*Id.* at 156-60.)  Garrison also testified that she was unable to perform certain of the duties referenced in the evaluation.  (*Id.* at 165-66.)[21]

Garrison's employment was on tenuous ground as a result of the three lunchtime incidents, the written warning for violating company policy, and the unsatisfactory evaluation.  The final straw

---

[20]    Garrison insists that every evaluation she had received prior to July 2002 had rated her performance "effective" or above.  (Garrison Decl., ¶ 18.)  In response, defendant argues that plaintiff's evaluation for the first quarter of 2002 had rated her unsatisfactory in five categories.  (Defendant's Exh. O.)  However, nothing on the first quarter evaluation reflects that it was ever given to or shared with plaintiff, and defendant offers no explanation for this omission.  Moreover, there is no indication as to who prepared the first quarter evaluation, when it was prepared, or why it conflicts with the testimony of Martin (who was Garrison's supervisor at that time) regarding plaintiff's performance.  For these reasons, the Court accepts as true plaintiff's testimony that she had never <u>received</u> a subpar appraisal prior to July 2002.  In so doing, however, the Court does not adopt plaintiff's counsel's representation that Martin's Declaration reflects that she did not evaluate Garrison's performance in the first quarter of 2002.  (Plaintiff's Brief, at 12.)  The Martin Declaration says no such thing, and plaintiff's counsel is admonished to avoid such blatant mischaracterization in briefs submitted to this Court in the future.

[21]    Garrison suggests that her evaluation was bogus because the restaurant-wide performance factors against which she was judged also applied to Hendley, as Restaurant Manager, yet he was not penalized for those poor results.  (Garrison Decl., ¶ 22.)  This contention misses two key points.  First, it overlooks the fact (discussed *supra*) that Hendley's predecessor, Martin, had been essentially forced to resign late in the second quarter of 2002 because of Travel Centers' concerns that the Grand Bay restaurant was performing unacceptably.  (Hicks Aff., ¶¶ 7-10.)  Thus, contrary to Garrison's contention, the Restaurant Manager was held responsible for the same restaurant-wide deficiencies for which Garrison was marked down.  Second, it ignores the fact that Hendley received no performance evaluation for the second quarter of 2002 because he was so new to that facility.  (Hicks Aff., ¶ 14.)

occurred on July 28, 2002, when Connelly received a message from Linda Southwick, owner of Outback Transportation and a Travel Centers customer, reporting an incident involving Garrison. (Connelly Aff. I, ¶ 16.)  According to Southwick, Garrison had engaged in such poor service and unprofessional behavior that she threatened to pull her company's business from Travel Centers.  (*Id.*) Southwick advised Hendley that Garrison "was rude and was of absolutely no help," refusing to assist her in getting toast she had ordered some 40 minutes previously, and refusing to deduct the price of the belated toast from her bill when it finally arrived.  (Defendant's Exh. Y.)[22]

> ### 3.    *Plaintiff's Resignation from Travel Centers.*

Connelly was dismayed to hear a Travel Centers customer complain that Garrison had behaved unprofessionally.  He wrote a blunt letter to Hendley dated July 28, 2002, indicating that he would not tolerate Garrison's conduct, that Garrison "has no comprehension of what the job entails," that she "stays in the kitchen and ignores the front of the house," that she "is not management material," that her rudeness to Southwick was grounds for termination, and that "we can no longer accept the incompetence of that position."  (Defendant's Exh. Y.)[23]  Later that day, Hendley and Connelly discussed the matter.  Based on Southwick's complaint and plaintiff's poor performance as described *supra*, it was decided that she would be given three options: (a) accept demotion to Cook III at $8.50

---

[22]      Garrison opines that the Southwick incident was "made up" to justify adverse personnel action against her.  (Garrison Decl., ¶ 21.)  However, Garrison's bare opinion is not evidence that Connelly never received such a complaint.  Had Garrison wished to investigate the matter through the discovery process, she certainly could have, inasmuch as the customer complaint enumerated both the identity and corporate affiliation of the person making the complaint, and the date, time and manner in which it was reported to Connelly.  There is no indication that Garrison did (or attempted to do) so.  At the Rule 56 stage, a plaintiff may not substitute uninformed speculation for reasonable investigation into the facts.  As such, Garrison's reckless, wishful guess that the Southwick complaint was "made up" is entitled to no weight.

[23]      Defense counsel asserts that Travel Centers sent Southwick complimentary gift certificates and discounts in order to keep her company's business.  (Reply Brief, at 3.)  The record is devoid of evidence supporting these allegations; therefore, the Court will not consider them for summary judgment purposes.

per hour, (b) resign, or (c) be terminated. (Connelly Aff. I, ¶ 18; Garrison Dep., at 167-68.)[24]  Those options were communicated to Garrison by Hendley on July 29, 2002, with a confirmatory letter being given to her a day later. (Hendley Dep., at 81.)

Upon receiving this information, Garrison left work, never to return. (Garrison Dep., at 247.) She never informed Hendley or anyone else of her decision as to the three options proffered to her. (*Id.*) A Travel Centers personnel action form effective July 31, 2002 states that Garrison was "demoted to cook and she resigned," but that she was eligible for rehire. (Defendant's Exh. Z.)[25]

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). However, the

---

[24]     The ultimate decision of how to resolve the Garrison situation was made by Hendley, as both Connelly and Hicks instructed Hendley to take whatever action he thought was best for the operation. (Hendley Dep., at 82, 106.)

[25]     In her deposition, Garrison testified that Travel Centers fired her. (Garrison Dep., at 167-68.) However, she does not dispute that she left work and failed to return, even though the company had a job for her, albeit a substantial demotion. As such, plaintiff's wrongful termination claim is actionable, if at all, only under a theory of constructive discharge or general disparate treatment.

mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

## III.    Analysis of Motion to Strike.

Antecedent to delving into the merits of the Motion for Summary Judgment, the Court is obliged to take up defendant's Motion to Strike (doc. 31), which takes aim at plaintiff's declaration (the "Declaration") submitted in opposition to summary judgment.  Travel Centers maintains that the Declaration suffers from three fatal flaws: (a) certain of its allegations are hearsay and are outside the scope of plaintiff's personal knowledge; (b) certain of its allegations are irreconcilable with and contrary to her deposition testimony; and (c) certain of its allegations are self-serving and conclusory.  The Court will consider each category of objections in turn.[26]

### A.    *Hearsay / Lack of Personal Knowledge Objection.*

Defendant's first objection is that several portions of the Declaration are contrary to Rule 56(e), Fed.R.Civ.P., which requires that summary judgment affidavits be "made on personal knowledge," that they "set forth facts as would be admissible in evidence," and that they "show affirmatively that the affiant is competent to testify to the matters set forth therein." *Id.*; *see generally New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp.2d 423, 427 (S.D.N.Y. 2000) (test for admissibility under

---

[26]    Defendant also offers a fourth objection relating to the Declaration's reference in Paragraph 12 to certifications Garrison had received, complaining that these items were not produced by plaintiff pursuant to Rule 26, Fed.R.Civ.P.  However, Garrison has not included these documents in the record, but has merely mentioned that she received them.  Defendant has failed to show any prejudice resulting from this testimony.  Under the circumstances, the Court does not deem it appropriate to strike all reference to these certifications in the Declaration.  The objection to Paragraph 12 is therefore **overruled**.

Rule 602 is "whether a reasonable trier of fact could believe the witness had personal knowledge of the facts to which he is testifying").  In the Eleventh Circuit, "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted); *see also Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (statements outside affiant's personal knowledge do not satisfy Rule 56(e)).

Defendant correctly notes that Paragraph 6 and the last two sentences of Paragraph 14 of the Declaration include statements about Kathy Martin's experience at Travel Centers predating Garrison's promotion into a managerial role.  As Garrison identifies no factual basis for her knowledge of these details of Martin's employment, these averments flunk the "personal knowledge" criterion and are therefore **stricken.**  Similarly, Paragraph 9 of the Declaration includes a statement by Garrison as to what she "was informed" by unidentified persons, who may or may not have been affiliated with defendant, about her training.  Inasmuch as this statement is both vague and plainly hearsay, the Court will not consider it on summary judgment.

By contrast, defendant's objection to Paragraph 20 is not well-founded.  In that paragraph, Garrison states that White had "expressed no plans to leave Grand Bay" despite four weeks of training. (*Id.*)  Defendant objects that Garrison lacked first-hand knowledge of White's intentions.  While that statement may be correct, defendant overlooks that Garrison does not profess to have knowledge of White's innermost thoughts, but rather is testifying to what she did or did not hear White say.  Surely Garrison can testify from personal knowledge as to whether she ever heard White express an intent to leave Grand Bay.  Such a statement is entirely proper nonhearsay and comports with Rule 56(e).  As such, defendant's objection to Paragraph 20 is **overruled**.

### B.    Contradiction of Deposition Testimony Objection.

Defendant next maintains that the Declaration conflicts with Garrison's deposition testimony.  It is well established that a litigant cannot manufacture a genuine issue of fact by submitting a "sham affidavit" that contradicts her prior testimony.  *See, e.g.*, *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is

directly contradicted by deposition testimony."); *Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (affiant cannot create genuine issue of fact by contradicting, without explanation, prior clear testimony).[27]

According to defendant, the Declaration contradicts Garrison's deposition, in violation of *McCormick* principles, in Paragraphs 11, 12, 15, 16, 17, 18 & 19. Each of these objections is unwarranted and results from a strained, contorted reading of the deposition transcript, the Declaration, or both. For example, in Paragraph 11, Garrison avers that she "had the tools necessary to handle [her] position" after attending training in Ohio. (*Id.*) Defendant contrasts that statement with Garrison's deposition testimony that there were aspects of her job that she had not yet mastered and that she needed to practice following training. There is no inherent conflict between the two statements, as one can both have the necessary tools to perform one's job and also require practice to refine and hone those tools. Similarly, in Paragraph 12, the Declaration states that Martin helped Garrison utilize skills learned during her training. Defendant claims this statement contradicts page 151 of Garrison's deposition, wherein she testified that Martin did not teach her about EBITDA. Again, there is no inconsistency here, as the statements may easily be harmonized. The same conclusion applies to defendant's objections to Paragraphs 15, 16, 17, 18 and 19. In each instance, defendant either misreads or distorts the Declaration, the deposition or both in order to formulate an illusory discrepancy between the two sets of statements. The Court specifically finds that the Declaration is not a "sham affidavit" in the manner described by defendant, and **overrules** defendant's objections on that basis.

### C.    *Self-Serving / Conclusory Objection.*

As noted previously, Rule 56(e) requires that affidavits be based on personal knowledge. Statements of speculation or personal belief are generally not proper. *See, e.g., Pace v. Capobianco*,

---

[27]    *But compare Stewart v. Board of Comm'rs of Shawnee County*, 216 F. Supp.2d 1265, 1270 (D. Kan. 2002) (considering information in affidavits that served to clarify, explain or correct prior misstatements, as affidavits were not a "sham" with respect to such information); *Brassfield v. Jack McLendon Furniture*, 953 F. Supp. 1424, 1430 (M.D. Ala. 1996) (noting that "sham affidavit" rule bars only affidavit statements that are "inherently inconsistent" with earlier deposition testimony).

283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact."); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record."); *Stagman*, 176 F.3d at 995 (explaining that statements that are conclusory or based on conjecture do not satisfy Rule 56(e)) .

Although defendant objects to them, Paragraphs 4 and 5 of the Declaration are neither speculative nor improper statements of personal belief.  Defendant's objections to these paragraphs are therefore **overruled**.  However, the Motion to Strike stands on a much stronger footing with regard to Paragraph 21, in which Garrison states, "[m]y negative evaluation and the alleged customer complaint about me was all made up to justify the action Mark wanted to take against me."  (*Id.*, ¶ 21.)  Garrison identifies no evidence in support of her belief that the Southwick incident was "made up."  She does not purport to have personal knowledge of whether Southwick did or did not contact Connelly to lodge a complaint thad Garrison had been rude and unhelpful.  Plaintiff's unawareness of previous customer complaints during her employment at Travel Centers does not in any way support an inference that the Southwick incident was "made up."  Likewise, her unadorned, conclusory statement that her second quarter performance evaluation was "made up" is far too cursory to be entitled to any weight in a Rule 56 analysis.  Accordingly, the Court finds that the first sentence of Paragraph 21 of the Declaration violates Rule 56(e), and it therefore is **stricken**.  Similarly, plaintiff's contention in Paragraph 21 that White received "a full-time job for several months at Grand Bay" is outside the scope of plaintiff's personal knowledge, and is likewise due to be **stricken**.

> ### D.    *Conclusion.*

In summary, the Motion to Strike is **granted in part, and denied in part**.  The Motion is **granted** with respect to Paragraph 6, the last two sentences of Paragraph 14, and the first and third sentences of Paragraph 21 of Garrison's Declaration.  Those referenced portions of the Declaration are **stricken**.  The Motion to Strike is **denied** in all other respects.

**IV.     Analysis of Motion for Summary Judgment**

The Complaint identifies two separate causes of action under 42 U.S.C. § 1981, one for discriminatory denial of a promotion and the other for disparate treatment relating to plaintiff's separation from Travel Centers.  Like Title VII, § 1981 prohibits intentional race discrimination in the making and enforcing of contracts, and has been routinely extended to the employment context.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004).  Although § 1981 claims do not share the exhaustion requirement of their Title VII counterparts,[28] the elements of a § 1981 claim mirror those for a Title VII claim.  The Eleventh Circuit has noted, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Cooper v. Southern Co.*, 390 F.3d 695, 724 n.16 (11th Cir. 2004) ("The *McDonnell Douglas* framework for establishing a *prima facie* case is used in intentional discrimination cases brought under either Title VII or Section 1981."); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (explaining that the Title VII burden-shifting framework for analyzing claims of discriminatory treatment also applies to § 1981 claims); *Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1311 (M.D. Ala. 2004) ("The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same.").  This Court therefore relies on the traditional Title VII framework to analyze plaintiff's § 1981 claims.

*A.     Failure to Promote Claim.*

*1.     The* McDonnell Douglas *Standard.*

With regard to plaintiff's § 1981 promotion claim, absent direct evidence of discrimination,[29] Garrison must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell*

---

[28]     *See, e.g.*, *Garrett v. Tandy Corp.*, 295 F.3d 94, 108 (1st Cir. 2002) (explaining that "section 1981 is not blunted by devices used in Title VII, such as agency exhaustion"); *Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1311 (M.D. Ala. 2004) ("Unlike their counterparts brought pursuant to Title VII, claims of race discrimination pursuant to Section 1981 do not require timely exhaustion of administrative remedies with the EEOC prior to suit.").

[29]     Plaintiff admits that she has no direct evidence of discrimination, inasmuch as she never heard anyone make any racially derogatory comments during her employment at Travel Centers. (Garrison Dep., at 212.)

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar,

tripartite burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race

discrimination.  If she does so, "the burden shifts to the employer to articulate a legitimate,

nondiscriminatory reason for [denying promotions to plaintiff]. ... If the employer does so, the burden

shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason

is merely a pretext for discrimination." *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453,

1457 (11th Cir. 1997) (citations omitted).[30]  A plaintiff may establish pretext "either directly, by

persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly,

by persuading the court that the proffered reason for the employment decision is not worthy of belief."

*Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir. 2003); *see also Wilson*,

376 F.3d at 1088 (plaintiff may prevail "by either proving that intentional discrimination motivated the

employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate

reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal

discrimination").  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's

Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

> 2.      *Plaintiff's Failure to Show a* Prima Facie *Case of Race Discrimination.*

To establish a *prima facie* case of discriminatory denial of promotion under § 1981, a plaintiff

must show that (i) she belongs to a racial minority; (ii) she was qualified for and applied for a position

the employer was trying to fill; (iii) she was denied the position; and (iv) others who were not members

of the protected class were hired, or the employer continued to seek applicants with the plaintiff's

qualifications.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir.

2005); *Cooper*, 390 F.3d at 724 n.16; *Wilson,* 376 F.3d at 1089; *Walker v. Mortham*, 158 F.3d

1177, 1186 (11th Cir. 1998).

---

[30]     A plaintiff's burden of proving a *prima facie* case is light.  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998); *see also Crapp v. City of Miami Beach Police Dep't*, 242 F.3d 1017, 1020 (11th Cir. 2001).

### a.    Plaintiff Did Not Apply for the Position.

Viewing the record evidence in the light most favorable to her, Garrison has failed to satisfy either prong of the second element of the *prima facie* case, inasmuch as she has shown neither that she applied for the position nor that she was qualified for it.  The record is clear that the Restaurant Manager position was posted on the Travel Centers Intranet and was made available internally for company managers to apply.  Garrison has not suggested that she lacked access to the Intranet or that she was unaware of the internal posting.  Moreover, it is undisputed that Garrison neither submitted an application nor expressed interest in the Restaurant Manager job to Travel Centers officials.[31]  The "application" requirement is designed to prevent imposition of civil rights liability on an employer for lacking sufficient clairvoyance and omniscience to divine an employee's unarticulated desire for a vacant job.  That is precisely the situation here, and plaintiff's failure to place Travel Centers on notice of her wish to be considered for the Restaurant Manager position is fatal to her § 1981 promotion claim.

Nonetheless, Garrison argues that her non-expression of interest in the Restaurant Manager does not bar her promotion claim because (a) Martin had been promoted to Restaurant Manager even though she did not actively seek the job; and (b) Travel Centers contacted Hendley (who was not working for the company at that time) to solicit his application for the job.  (Plaintiff's Brief, at 13.)  The problem with this argument is that it would negate the legal requirement that a plaintiff express interest in a posted position, as a prerequisite to any failure to promote claim.  *See Lockridge v. Board of Trustees of University of Arkansas*, 315 F.3d 1005, 1011 (8th Cir. 2003) (plaintiff who does not formally apply for a posted position "must make every reasonable attempt to convey his or her interest in the job to the employer before he or she may prevail on a discrimination claim"); *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1228 (10th Cir. 2001) ("To establish a *prima facie* case for failure to promote,

---

[31]    In a patently deficient attempt to show otherwise, Garrison makes reference in her Declaration to "my clear interest in becoming a manager" after Martin's resignation.  (Garrison Decl., ¶ 14.)  Plaintiff offers no hints as to what was "clear" about her interest, much less how (if at all) she manifested that interest to the relevant decisionmakers.  The only evidence on that score is Connelly's unrebutted testimony that Garrison never requested consideration for the Restaurant Manager job vacated by Martin.  (Connelly Aff. I, ¶ 7.)

-22-

plaintiff must show, among other things, that she applied for--or at least sought--the position at issue.")
(emphasis added). Garrison identifies no authority for the proposition that a civil rights plaintiff may sit
on her hands and be excused from seeking out a posted position if the employer has at certain times
approached other candidates to solicit their applications, and this Court is aware of none.[32]  This Court
is aware of nothing in the civil rights statutes or interpretive case law that would oblige Travel Centers to
attempt to persuade, wheedle or cajole Garrison to submit an application for an advertised position in
which she had not expressed interest.  The onus was on Garrison to apply, not on Travel Centers to
guess that she might be interested and lobby her to do so.

     As plaintiff has offered no legal basis for being excused from applying for a posted position
simply because the employer approached other people to apply for vacant jobs, the evidence regarding
Martin and Hendley is inconsequential as to the application element of the *prima facie* case.  Because
Garrison neither applied nor otherwise sought the Restaurant Manager position, she cannot satisfy her
*prima facie* burden and her § 1981 failure to promote claim is wanting, as a matter of law.

*b.*       *Plaintiff Was Not Qualified for the Position.*

     Even if Garrison could somehow satisfy or circumvent the application requirement, her ability to

---

[32]     To be sure, *sua sponte* review of applicable precedents shows that the application
requirement is not universal, but rather is subject to two qualifiers.  First, "where an employer does not
formally announce a position, but rather uses informal and subjective procedures to identify a candidate,
a plaintiff need not show under the second prong that he applied for the position--only that the
employer had some reason to consider him for the post."  *Vessels*, 408 F.3d at 768.  The problem for
Garrison here, of course, is that Travel Centers unquestionably <u>did</u> formally announce the position and
solicit applications generally from its managerial ranks; therefore, the *Vessels* rule is inapplicable.
Second, courts in this Circuit have recognized that a plaintiff need not apply for a position if she can
show that her application would have been futile.  *See Cooper v. Diversicare Management Services
Co.*, 115 F. Supp.2d 1311, 1318 (M.D. Ala. 1999) ("A plaintiff may establish a *prima facie* case
without demonstrating that she applied for a position if she shows, instead, that an application
would have been futile due to the employer's discriminatory practices.") (citing *Taylor v. Hudson Pulp and
Paper Corp.*, 788 F.2d 1455, 1462 (11th Cir.1986)).  Plaintiff having made no showing of futility here,
this Court will not undertake to formulate her arguments on summary judgment for her.  *See Sanders*,
319 F. Supp.2d at 1315 n.15 ("There is no burden upon the district court to distill every potential
argument that could be made based upon the materials before it on summary judgment; the onus is on
the parties to formulate arguments.").

satisfy her *prima facie* burden would be compromised by her inability to show that she was qualified for the Restaurant Manager job. "[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications," inasmuch as the *prima facie* standard is "designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession." *Vessels*, 408 F.3d at 769. That said, a plaintiff's failure to meet *bona fide* written job requirements in a posting precludes her from making a *prima facie* case of discriminatory promotion. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317-18 (5th Cir. 2004) (declaring that plaintiffs had failed to show *prima facie* case in § 1981 failure to promote claim, where plaintiffs' records did not, on their face, meet written requirements in job posting).

Plaintiff admitted in her deposition that she was not ready to be a manager in May 2002.[33] The decidedly nebulous phrasing of being "ready" for a promotion smacks of a subjective qualification and therefore will not be considered for *prima facie* case purposes. More importantly, though, the applicable job posting made clear that internal candidates were ineligible for the job unless they had spent at least 18 months in their current assignment. The 18-month prerequisite is undoubtedly an objective qualification, and there is no dispute that Garrison was well shy of that requirement as of May 2002. General Manager Hicks testified that Garrison's failure to satisfy the 18-month criterion automatically disqualified her from consideration for the Restaurant Manager slot. (Hicks Aff., ¶ 11.)

Garrison responds that the 18-month rule was flouted by defendant and therefore a sham, notwithstanding Travel Centers' written policies and postings to the contrary. Her only evidence relates to the experience of Kathy Martin, who had been promoted from Assistant Manager to Restaurant

---

[33]     In particular, the following telling exchanges occurred:

      "Q:    So when you left [Ohio training in May 2002], you weren't ready to be a manager, you were ready to be trained further?

      "A:    Yes, ma'am."

                                *                     *              *

      "Q:    You weren't ready to be a manager, were you?

      "A:    Not yet."

(Garrison Dep., at 111-12, 115.)

-24-

Manager at the Grand Bay location in December 2000.  Martin states in her declaration that when she became Restaurant Manager, she "had not been assistant manager for 18 months."  (Martin Decl., ¶ 4.)[34]  But plaintiff's reliance on Martin's experience is misplaced because it relates to a different posting and predates the promotion decision at issue in this case by more than a year.  There is no evidence that Travel Centers had an 18-month policy in effect in December 2000.  There is likewise no evidence as to the contents of the job posting (if any existed) for the December 2000 promotion, and whether any 18-month requirement was articulated therein.  There is not even any suggestion that the decisionmakers for the Martin promotion were the same as those in May 2002.  Simply put, plaintiff has failed to show any link between the Martin promotion in 2000 and the legitimacy of the 18-month criterion for the Restaurant Manager job posting in May 2002.

The record establishes that Travel Centers provided in a written job posting that no internal applicant could be considered for the Restaurant Manager vacancy at the Grand Bay location in May

_____

[34]      In its reply brief, defendant challenges the Martin Declaration on this point by producing employment records purporting to reflect that Martin became Assistant Manager on November 1, 1998, and that she was promoted to Restaurant Manager on December 20, 2000, some 25 months later.  (Defendant's Exh. EE; Reply Brief, at 1-2.)  Based on this evidence, defendant urges the Court to reject the averment in Martin's Declaration that she had not been an Assistant Manager for at least 18 months prior to her promotion.  The Court cannot do so.  Employment records for Martin may contradict her Declaration and create a fact dispute as to whether she had been in the Assistant Manager post for at least 18 months, but they do nothing more.  Elementary Rule 56 principles forbid this Court from accepting one piece of evidence favorable to the defense and rejecting a contrary piece of evidence favorable to the plaintiff on summary judgment.  Perhaps recognizing this dilemma, defense counsel proffers an unsupported representation that "Ms. Martin states the dates on TA's documentation of Ms. Martin's promotions are correct and [that she] was APCM for twenty-five (25) months prior to her promotion to PCM."  (Reply Brief, at 2.)  Defense counsel further represents that Martin signed her Declaration on plaintiff's behalf without having reviewed her personnel file and that, "after Ms. Martin reviewed her personnel file, the personnel file refreshed her recollection that she was an APCM for twenty-five (25) months prior to being promoted to PCM."  (*Id.* at 5.)  As the Court has taken pains to explain *supra*, it cannot simply take counsel's word for it.  The proper way to present this evidence would be through a supplementary affidavit, which defendant has not submitted.  Counsel's naked representation as to what Martin now says or believes is obviously not evidence that can be considered on summary judgment.  The Court therefore affords no weight to defense counsel's unsupported statements regarding Martin's present beliefs as to the accuracy of her Declaration.

2002 unless she had held her previous position for at least 18 months.  Garrison undisputedly had not.
As such, she failed to meet the objective qualifications for the position, and cannot make a *prima facie*
showing of discriminatory failure to promote, in violation of 42 U.S.C. § 1981.

### 3.    Conclusion.

In light of the foregoing discussion, the Court concludes that Garrison has failed as a matter of
law to satisfy two elements of her *prima facie* burden for the failure to promote claim.  In particular,
she has made no showing that she applied for or otherwise sought the Restaurant Manager position in
May 2002, or that she satisfied the job's minimum objective qualifications.  These defects preclude
plaintiff from proceeding to trial on her non-promotion allegations, and entitle Travel Centers to
summary judgment in its favor on that cause of action.[35]

### B.    Disparate Treatment Claim.

Plaintiff's lone remaining claim is that Travel Centers engaged in disparate treatment on the
basis of her race by offering her the alternatives of involuntary termination, demotion to an hourly

---

[35]    Even if the Court were to assume that Garrison could make the requisite *prima facie*
showing that Travel Centers' failure to promote her to Restaurant Manager was discriminatory, this
claim still could not withstand Rule 56 scrutiny.  Defendant has offered several legitimate
nondiscriminatory reasons for its decision not to promote Garrison, but instead to hire Hendley, to-wit:
(a) Garrison was not qualified for the job; (b) Garrison's managerial performance was subpar and she
had difficulty performing basic Assistant Manager responsibilities; (c) the company perceived that she
lacked management capability; and (d) Hendley was far more qualified than Garrison.  (Hicks Aff., ¶¶
11, 16; Connelly Aff. I, ¶¶ 8-10.)  Defendant having met its burden of production, "the employee must
come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate
reasons given by the employer were not its true reasons, but were a pretext for discrimination."
*Vessels*, 408 F.3d at 771.  "This evidence must reveal such weaknesses, implausibilities,
inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its
actions that a reasonable factfinder could find them unworthy of credence."  *Id.* (citations omitted).
After careful review of the record, the Court concludes that Garrison has failed to make a sufficient
showing of pretext to survive summary judgment.  As such, even if she could establish a *prima facie*
case (which plaintiff manifestly cannot), Travel Centers would still be entitled to entry of judgment in its
favor as a matter of law on the § 1981 failure to promote cause of action.

position, or resignation.[36]

Under § 1981, a plaintiff can establish a *prima facie* case of disparate treatment by showing the following elements: (i) she belongs to a racial minority; (ii) she was subjected to an adverse job action; (iii) her employer treated similarly situated employees outside her protected class more favorably; and (iv) she was qualified to do the job. *See, e.g., Wilson*, 376 F.3d at 1091; *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). "A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005). "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant." *Id.*

The parties disagree vehemently as to whether Garrison can satisfy the third and fourth elements of a *prima facie* case of disparate treatment. The Court harbors substantial doubts as to her ability to do so, particularly with respect to the third element. Nonetheless, for purposes of this analysis, the Court will assume (without deciding) that plaintiff has adequately made a *prima facie* showing.

Travel Centers has unquestionably met its burden of production by providing a legitimate nondiscriminatory justification for the adverse employment action of which Garrison complains. In particular, Travel Centers has presented competent evidence that it removed or induced Garrison to resign from her position as Assistant Manager because of her unsatisfactory job performance, as evidenced by the three lunchtime incidents, the written warning for violating company policy, her unfavorable performance evaluation, and the customer complaint involving Linda Southwick. Therefore, the Rule 56 Motion hinges on whether Garrison can show pretext.

---

[36]     The Court recognizes that, in connection with the Joint Proposed Pretrial Order (doc. 34), a firestorm of controversy has erupted as to whether this cause of action is properly couched as one for discriminatory discharge or discriminatory constructive discharge. For Rule 56 purposes, however, this semantics disagreement is immaterial. Regardless of which label attaches, it is plain that Travel Centers took adverse employment action against Garrison. Whether this employment action is framed as a termination, a demotion, or a constructive discharge makes no difference to this analysis.

Plaintiff hypothesizes that the adverse job action at issue was motivated by the company's desire to "force[ her] out of her position to make room for a white employee named Michelle [*sic*] White."  (Plaintiff's Brief, at 5; *see also* Garrison Decl., ¶ 19.)  But the evidence does not back up this conjecture.  Garrison admitted that she does not know whether White replaced her or not.  (Garrison Dep., at 175.)[37]  The uncontroverted evidence is that White was hired as a Trainee Restaurant Manager, that she was sent to the Grand Bay location on a temporary basis to be trained by Hendley, that she was never on the Grand Bay payroll, and that she was assigned to be Restaurant Manager at a Travel Centers location in Virginia in September 2002 after her training concluded.  There is therefore no evidence that White replaced Garrison, much less that Travel Centers nefariously forced Garrison out of the company to make room for White.  Indeed, White remained at the Grand Bay site for just a few weeks after Garrison's dismissal, so plaintiff's argument that White took her job is not viable.

Undeterred by the facial insufficiency of her arguments relating to White, plaintiff attempts to rebut the disciplinary issues culminating in her demotion/dismissal, with the exception of the one written warning.  With regard to the lunchtime incidents, Garrison does not deny that they occurred, but instead argues that a reasonable jury could find that Travel Centers concocted them because Garrison and Hendley did not work the same shifts and because they were not reduced to writing.  (Plaintiff's Brief, at 9-10.)  This contention falls well shy of raising an inference of pretext.  As noted, plaintiff has never denied that these events occurred.  Moreover, the undisputed evidence is that Garrison worked the lunch shift at least four days per week, and that Hendley or White was always present with her during those shifts, such that Hendley and Garrison in fact did work lunch shifts together.  (Hendley Aff., ¶¶ 6-

---

[37]   The relevant passage from the deposition transcript reads as follows:

"A:   After he train her, she was – she replaced me because she become a manager there.
"Q:   Do you know that for a fact, Ms. Garrison, or was she still training?
"A:   I don't know.
"Q:   That's just it.  You don't know, do you?
"A:   No."

(Garrison Dep., at 175.)

7.)  And the absence of a write-up, without more, does not create an inference that these alleged incidents did not happen.

Plaintiff also takes aim at the performance evaluation, arguing that it is "a Defendant ploy to support its claim that Ms. Garrison was a poor performer during 2002."  (Plaintiff's Brief, at 10.)  To support this assertion, plaintiff points out that all evaluations she had received previously were favorable, that Hendley had only recently become her supervisor, and that even though many of the objective barometers on her evaluation related to restaurant performance as a whole Hendley was not downgraded for them.  (Plaintiff's Brief, at 11-12.)  However, Hendley testified that the month and a half period in which he had worked with Garrison was a sufficient time period in which to observe her performance and properly evaluate her.  (Hendley Dep., at 87.)  There is no evidence, besides plaintiff's conjecture, to the contrary.  Likewise, defendant has explained that Hendley was not evaluated for the second quarter of 2002 because he had been there for too short a time to be held responsible for the restaurant's longstanding shortcomings.  (Hicks Aff., ¶ 15.)  By contrast, Garrison had been an Assistant Manager at the Grand Bay location for more than a year, and therefore bore direct responsibility for that restaurant's failure to meet its goals in 2001 and early 2002.[38]  Finally, the bare fact that Garrison's pre-2002 evaluations had been favorable, without more, does not raise an inference of pretext.  Plaintiff does not point to a single positive review that she had ever received relating to her performance as an Assistant Manager.  That plaintiff was rated highly as an hourly employee, or during managerial training sessions, in no way undermines the validity of, or is inconsistent with, the unfavorable performance appraisal she received as an Assistant Manager in July 2002.

Finally, plaintiff endeavors to evade the Southwick incident, not by denying its occurrence but by accusing Travel Centers of fabrication because there had never been previous customer complaints

---

[38]    The weakness of plaintiff's argument related to Travel Centers' treatment of Hendley is underscored by evidence that Hendley's predecessor, Martin (who was white), was offered demotion in May 2002 because of the restaurant's poor performance.  Thus, both Garrison and Martin were held responsible for the restaurant's subpar showing in the first half of 2002 while they managed the restaurant.  Garrison's attempt to show that she was singled out for a poor evaluation because of her race is contrary to the undisputed facts that a white manager suffered similar adverse treatment just two months earlier predicated on unsatisfactory restaurant results.

about her.  What may or may not have occurred in the past is not evidence that Southwick did not lodge a complaint against Garrison for poor service.  But even if Garrison were to offer evidence disputing that the Southwick incident occurred (which she has not), she has not called into question the sincerity of Travel Centers' belief that it did.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (employee failed to show pretext where he presented evidence that allegations were untrue, but did not show that employer's belief in those allegations was unworthy of credence).  Whatever actually transpired between plaintiff and this customer, there is no evidence that Linda Southwick did not complain to Connelly about Garrison's alleged rudeness and unprofessionalism on July 28, 2002, and threaten to pull her company's business from Travel Centers.  There is no evidence that Travel Centers' belief in the occurrence of this incident was unreasonable.  Given the severity of the customer service allegations leveled by Southwick against Garrison, it was not pretextual for Travel Centers to take adverse action against plaintiff on that basis.

Simply put, it is the opinion of this Court that Travel Centers has offered ample evidence to justify the adverse employment action it took against her on or about July 29, 2002, and that Garrison has failed to meet her burden of showing that this justification is a pretext for unlawful race discrimination.  Travel Centers is entitled to summary judgment on the adverse action claim.

## V.      Conclusion.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that defendant is entitled to entry of judgment in its favor as a matter of law.  As such, the Motion for Summary Judgment (doc. 17) is **granted**, and plaintiff's claims are **dismissed with prejudice**.  The Motion to Strike (doc. 31) is **granted in part** and **denied in part** as set forth *supra*.


DONE and ORDERED this 20th day of July, 2005.


                                                    s/ WILLIAM H. STEELE                    
                                                    UNITED STATES DISTRICT JUDGE